is up in case for today is 2019-1951, Sharp v. HHS. I would like to begin by addressing Sharp's vaccine injury table claim. The first point I want to make here is that the definition of encephalopathy and the qualifications and age to interpretation cannot be rationally applied to define a pre-vaccination encephalopathy. Do I understand right that the Court of Federal Claims, at least on the non-table claim, didn't rely on the pre-vaccine portion of the analysis, but only on the post-vaccine portion, and said that QAI does apply to that and there wasn't evidence of the required QAI symptoms within the 72 hours, so that whenever one thinks about the pre-vaccine, you haven't succeeded on the non-table, I'm sorry, on the table portion of the analysis. You're exactly right. That's exactly what the Court of Federal Claims held, and that was the Court of Federal Claims' error, because the vaccine injury table, the structure of the table, makes it clear that what a petitioner must prove in a significant aggravation case is not that the individual suffered the condition defined in the definition of encephalopathy, after vaccination, but that the petitioner must show that he suffered a significant aggravation of the pre-existing condition after the vaccination, and the Vaccine Act does define significant aggravation, and that is any change for the worse in a pre-existing condition which results in markedly greater disability, pain, another term, accompanied by a deterioration of health. So do you not think that for a table case that there has to be an acute encephalopathy proven within the first 72 hours after the vaccine? Please ask that again. Is it your view that there does not have to be, for a table case, evidence of an acute encephalopathy within 72 hours of the vaccine? That is absolutely my argument. Your argument is there doesn't have to be one at all? There doesn't need to be an acute encephalopathy at all. Because what the table requires, if you look at either in the statute or in the regulation, what the table requires is that you have... It's 42-300-AA-14, and this is the A. I guess I don't know what you're going to read from. I'm looking at the vaccine part 100, vaccine injury compensation 100.3, vaccine injury table. That's fine, too. Both the table and the regulation use the same structure. So if you look at the... The table says for a DTAP vaccination, you have to prove encephalopathy within 72 hours. What it says is that the time period for first symptom or manifestation of onset or of significant aggravation after vaccine administration. You're reading there from the statute, 300-AA-14, subsection A. Can you say that again? You're reading from the statute there? I think you are from... Both the statute and the regulation. If you look at the table itself... Right. And the regulation 100.3A uses the same language. Yeah. Okay. On the right side of the table... So on the left side is the vaccine. In the middle is the condition that qualifies for a vaccine injury table case. And on the right side is what must be proven to occur within the time frame specified by the table. And that column on the right side of the table says that the petitioner must prove either the onset of the vaccine injury table condition or the significant aggravation of a vaccine injury table condition. Yes, but you have to first have had the vaccine injury table complication in order to have a significant aggravation of it, right? How can you have significant aggravation of an encephalopathy if you don't have an encephalopathy? It has to be an encephalopathy, but not an encephalopathy as defined by the qualifications. Okay. You know what? You have such a limited amount of time today. Could I get you to move to your off-table claim, please? Sure. Now, on the off-table case, the question is whether the special master's analysis of the off-table case is consistent with the standards for the analytical framework set out in Loving v. Secretary of Health and Human Services, which is a six-step standard, which requires what the petitioner must prove in order to prove an off-table significant aggravation case. That's set out by Loving v. Secretary of Health and Human Services. It is our contention that the special master got the third step of the Loving analytical framework wrong. He required, we believe, that the third step of the analytical framework requires the petitioner to show that there was a change for the worst in the injured person's condition after vaccination and that the third step of Loving does not include any consideration of what the natural course of the pre-existing condition would have been, that that is a part of the fact-run related defense. Now, if the petitioner is able to prove a premenopausal case, the secretary can prove that the pre-existing condition, in fact, caused the change for the worse and was the sole substantial factor in the cause of the change for the worse. But Loving's step three... You hear when you're talking about the pre-existing condition, you're talking about the mutated gene? Yeah, we're talking about whether you call it, in the table case it's critical, we call that an encephalopathy. But in the off-table cases, we know it was a pre-existing condition. Everyone believes, everyone can see that there was a pre-existing condition here. As I understood you during this question, is that pre-existing condition the genetic mutation? Yes, absolutely. That's the short answer. The long answer might be it's both the genetic condition and the manifestations of that genetic mutation. So you're saying that for step one of prong three, the special master should have looked at the condition of LH before having received the vaccine and then after the vaccine in order to detect that there was an aggravation? Please ask that again, I'm sorry. I didn't understand your question. Yes. Was a special master supposed to have looked back to the condition of the child before receiving the vaccine and then looking at the condition of the child after they received the vaccine at the beginning, let's say, with the first onset? If I understand the question, the child's pre-vaccine condition is the child's clinical manifestations before vaccination. In the white cotton case, the court's explicit holding was that you don't consider the projected outcome of a pre-existing condition when you're determining whether the child suffered a significant aggravation. That was the critical holding in the white cotton case. And the reason, and they went on to say, that that issue in a cable case can be the expected outcome of the pre-existing condition can be the source of a defense for the Secretary of Health and Human Services if the Secretary is able to demonstrate that the pre-existing condition would have caused the significant aggravation. Do I understand, I'm familiar with white cotton and I'm very familiar with the loving factors. I think that if I understand it right, one of your arguments is that the special master's fact findings across the board were erroneous, in part because they were pervaded by this view that somehow you had to disprove that the mutation is why she is the way she is today. It's almost like he didn't sort of look right before the vaccine and right after and say, what's going on? He's looking at how she is today and saying, well, the evidence of record shows it's possible for someone with this mutation to end up as bad as she is. Therefore, you haven't met your burden of proving significant aggravation. And that seems to me to possibly be an error of law that pervades his fact findings because he's putting the burden on you to disprove the mutation as opposed to looking at whether you've established causation. That is exactly my argument. And across the board, the way you said it is perfectly right. Across the board, the special master assumed that the presence of a genetic mutation that could have caused LM's current condition, that the mere presence of a genetic mutation capable of causing a bad outcome was sufficient evidence to prove that there was a bad outcome and preclude us from proving our case. And that was a fundamental legal error because it was inconsistent with the Knudsen case. Once again, that was the finding of the Knudsen case, that the presence of an alternate factor, of a potential alternate cause alone, isn't enough. You're into your rebuttal time. Do you want to save the remainder? I'm sorry? You're in your rebuttal time now. Would you like to save the rest? I will come back. Very good. Let's hear from the government. Good morning, Your Honors. May it please the Court. It's not necessary for the Court to reach the question of what legal standards should apply in on-table significant aggravation cases. I'd like you to go straight to the off-table. We don't have a lot of time. Because the Court can resolve this appeal on a single narrow factual issue, and that is that the special master found that LM's vaccines did not significantly aggravate her pre-existing condition because her genetic mutation by itself explains her outcome. Are you framing that as the rebuttal that the government gets to undertake, a la if she establishes causation, if she meets her burden, then the burden flips to the government to disprove causation? So you're kind of hinging on footnote 47 where he says, oh, yeah, and even if the government met this alternative burden of theirs. Is that where you're starting right now? I think that gets into whether we're talking about an on-table case or an off-table case. I said I want you to focus only on off-table. Right. And so because we are focusing on the off-table case that the petitioner is making, the petitioner is the burden party. And so it is their burden of persuasion. And this Court has held in cases like W.C. Yes, but if they've established causation, you then have to come back and prove that, no, it was something else. Right. But this Court has held that the special masters are permitted to consider the government's evidence in determining whether the petitioner has made a claim. And that is what the special master did here. He acknowledged that the petitioner provided some evidence to support their claim that the Our law does not support the proposition that any time there's an alternative causation that that's going to dictate the outcome. And then it's the burden on the petition to prove otherwise. No, it's the burden is on the special master to weigh the evidence and look at all of the evidence that's submitted. It seems to me that your argument is that once there's an alternative, in this case, the mutated gene, then that's it. That dictates the outcome from the special master's point of view. Respectfully, Your Honor, I don't think that's what the special master did, and that's not what we were arguing. I think that the petitioner's experts in this case relied primarily on the location of the mutation on the gene. This is primarily from their geneticist, Dr. Bowles, who argued that because the mutation was in the stem domain of the gene, that mutations in that part of the gene are generally associated with a milder outcome. Well, Dr. Descartes, the government's expert, agreed with that, but then said, in her words, there are exceptions to that rule. So if there's a bell curve, there's no doubt that LM is among the worst impacted in terms of her cognitive disability and her gross motor skill disability based on all the studies that were presented to us in the appendix. And so what Dr. Descartes has testified to is just because this is located in the tail or stem doesn't mean it couldn't happen. It is just that if it's located in the motor portion of the gene, it's much more likely to cause a severe impact in the expression of the protein and then the impact on cognitive. And am I saying this all right? Yes, yes. According to Dr. Descartes and the medical literature that she relied on, there are exceptions. There are instances where mutations that are in the stem domain are associated with more severe outcomes. So here's my problem. My problem for that is she referred to that as the exception. And my problem is it depends on whose burden it is, right? If it's their burden to prove that it couldn't have been the gene that caused it, then her testimony might be enough. Well, it's normally not the case that somebody with the mutation in the location she has it is this severe, but it does in an exceptional case happen. But if it's your burden to have to establish that this was more likely the cause than the vaccine, then I'm not sure her testimony that in an exceptional case, somebody with it at this location could be this bad could ever satisfy your burden. Do you understand? I do, Your Honor, but she had the added evidence of an individual with the exact same mutation that LM has. I'm so glad you brought that up because here's some clear errors of law in the special master's conclusions. Do you know that he found that LM's mutation was de novo? Do you know what that means? Yes. She did not inherit it from either of her parents. Except were both of her parents tested? There is a question about it appears that her father was not tested. The father was not tested. So does that mean we know for sure it's de novo? We do not in terms of the... We don't. We don't know if it's de novo, but yet the special master found it was de novo, and Dr. Descartes at page A388 used that, the conclusion that LM's own presentation was de novo, as further evidence supporting the idea that people with de novo expressions of this mutation are more likely at the severe end of the disability chain. So isn't that a real problem? Your expert relied on a fact that she understood to be true about LM that's not actually true or proven in this case. First of all, I'm not sure that that finding has been challenged on appeal. But second of all, that was not the only piece of information that the expert relied on. She relied on the fact that there is an exact person with this exact mutation... And that person does what? Was de novo. The study makes it clear. And she actually says it expressly. That person had a de novo expression. And she does say at 388 that familial expressions are usually far less severe. So we don't know whether LM's expression was de novo, but this special master treated it as though it was, and your expert did as well. And that was part of what she wrapped into her conclusion and his fact finding, him being the special master, her being the expert. So I don't know what to do with that. All I can tell you, your honor, is that that's not the sole piece of information that was relied upon. There was also the testimony of our pediatric neurologist who testified about infantile spasms and testified that the course of LM, her clinical course, was consistent with what he sees with all of his patients with infantile spasms. There also is just no evidence that links vaccines with causing or significantly aggravating infantile spasms. Let me just stop for a second. Descartes testified, and this is again your expert, that her spike in fever could have caused the seizure that she then experienced, right? The spike in fever, which is the result of the vaccine, could have caused the seizure. She testified that was possible. And then she also testified that once you have seizures, you're more prone to having more seizures. I don't recall that being her testimony. I believe that was the testimony of the petitioner's expert. Okay. Well, in any event, either way, if the vaccine caused a fever, which caused the seizure, and then if the record only has evidence that suggests that seizures, sort of each new seizure causes an increase in damage and therefore makes you more susceptible to more seizures, how do we, I mean, I guess I'm really struggling with the factual presentation of this case. Well, then let's move away from the prong three and talk about the other prongs of often, because the other issue with petitioner's off-table case is the special master correctly found that they did not offer a medical theory explaining how vaccines actually could significantly aggravate, interact with this genetic mutation to aggravate her underlying disorder. Well, if they did establish, and your expert did, that the vaccine caused the fever, the fever caused the seizure, and then if their experts say, and once you start having seizures, it's going to escalate the seizure disorder, why isn't that enough? That wasn't their theory, though. But it was one of the things their expert expressly said. Well, not in terms of by preponderance of the evidence or more likelihood than not, this is what happened. The special master examined all of their evidence. Dr. Bowles, their geneticist, said he had no idea which vaccine even was the causal vaccine, but he wasn't really focusing on that. He was more focused on the temporal connection between the vaccines and her seizures that did not actually occur within the table timeframe. Dr. Schumann focused on supposed MRI abnormalities that the treating physicians who read the MRIs did not even identify. And he was trying to somehow link the MRI abnormalities to interacting with vaccines, but he never really explained the theory either. So setting aside whether the vaccine caused the initial seizure and that somehow changed the course, petitioners not offered a theory to explain how that happens, which is part of their burden. So I guess I'm confused because part of what's bothering me about this case is you have a little girl who, at a wellness visit, was lifting up her head, was babbling, was reaching for things, was making great eye contact. Then she's administered a vaccine. She spikes an immediate fever. There are frantic phone calls from her mother to the doctor, phone calls to the ER, takes the girl to the ER after she has what is a full-blown, undoubtedly described seizure. Then she proceeds in the hospital to have a bunch more seizures while she's in the hospital. It's hard for me to imagine a circumstance, and she has never returned, by the way, to the child that she was before the vaccination. So it's hard for me to imagine how we wouldn't say there's a proven aggravation here. That's where I'm struggling. Well, because this Court's holdings say that in determining whether there is a significant aggravation, a significant change for the worse, you look at what the known natural course of the disease is. And as Dr. Zimpel, our pediatric neurologist, testified, infantile spasms, they arise between 6 and 12 months of age, which is the age at which children are receiving vaccines on almost a monthly basis. And so just by chance alone that this is going to arise in temporal proximity to vaccination is a given. And as Dr. Zimpel also testified and the special master found, Ellen was likely experiencing mild seizures before her vaccinations. They were just unrecognized by her parents. But the medical records post-vaccination include reports from the parents saying, oh, now looking back, we noticed that there were these times when she would space out. And the special master found, based on Dr. Zimpel's testimony, that those very likely could have been seizures that were occurring before vaccination. That's just the natural course of infantile spasms. Why would that be an aggravation from mild to severe seizures? Because part of proving that it's an aggravation is proving that the vaccines somehow changed the course of this condition. And this is exactly the same analysis that this Court has encountered before in the SCN1H genetic mutations. In which case? These are the Stone and Hammett, the Harris and Snyder cases. These are the string of the Dravet syndrome cases, a number of which have come up to this Court, all of which have been affirmed. They all involve gene mutations. You don't mention white cotton, which preceded those cases. Well, white cotton was a table case. And I can address the table claim if you'd like. But there is no evidence in this case that would support that LM suffered a table encephalopathy either before or after her vaccination. Didn't Loving expressly say it was adopting the white cotton factors? Well, yes. And that's three through five. It expressly said we're adopting the white cotton factors, but we should somehow read it in exclusion to white cotton's view of what you consider and don't consider as part of those factors? Well, I'm not sure what you're referring to in white cotton at this point. My reading of white cotton is that that was a case involving a child who the special master had found had a preexisting encephalopathy based on the fact that she had microcephaly. And so the question there was then when she got vaccinated and a few days later experienced seizures, whether that constituted a significant aggravation of her preexisting encephalopathy. Page 309 of the appendix with me, page 309. And I only want you to do this because you suggested to me that you didn't believe Dr. Descartes testified as I was suggesting about seizures causing more seizures and being the causation. So page 309, I understand this to be her expert report, and am I mistaken about what this document is? If you could direct me to where on the page you're looking. I am currently looking at neuroinflammation. Do you see where she says that? Neuroinflammation is the start of a paragraph about halfway in the middle of the page. Do you see that or not? I see her stating that in a general sense. Do you see where she says, wait, do you see where she says, neuroinflammation is a putative common mechanism in different forms of EE. Wait, here's the important part. Seizures induce neuroinflammation, which in turn fosters further seizures. Do you see that to be the government's expert's opinion? Again, Your Honor, I see her stating that in a general sense. I do not see her stating that that is actually what happened in this case. I mean, her exact opinion was that the vaccines did not alter her outcome. So I find it hard to see how her making that statement. I know. I also found it hard to see how she got to that conclusion. Your Honor, I see that my time is running short. I will just wrap up by saying that the evidence in these cases is similar in nature to that that was presented in the SCN1A Gervais syndrome cases, which this Court affirmed the Special Master's finding in those cases that the genetic mutation alone explained the outcome and the vaccines did not alter the clinical course. Is this the Dravet syndrome cases? Yes, Your Honor. I see the parallels between them. But it was another thing that bothered me about the Special Master's decision was he expressly said he was relying on them in his assessment. And I thought it seems wrong for him to rely on cases involving an entirely different genetic mutation as part of his analysis of concluding whether she established causation in this one. I mean, do you think it's proper to do that? I think the fact that this Court has affirmed on numerous occasions Special Master's analyses in those cases, it was appropriate for the Special Master to employ a similar analysis based on similar evidence in this case. And for that reason, we think it should be affirmed. Okay. Mr. Webb, you have some rebuttal time. Real briefly, first on our table case, I want to point out that in White-Cotton, the Court of Appeals focused on whether there had been a change, that is a significant aggravation in Maggie White-Cotton's condition, not on whether that condition satisfied the definition of encephalopathy. There's no discussion of whether the post-vaccine condition of that child matched the definition of encephalopathy. The whole question is whether a condition fit. And then I want to focus real quickly on the question about the SC and 1A cases. The SC and 1A cases show what the Secretary did not prove in this case and did prove in the SC and 1A cases. In the SC and 1A cases, most children that had an SC and 1A gene mutation had a severe outcome. Overwhelming majority, 70, 80 percent at least, of the children with that gene mutation had a bad outcome. Moreover, the vast majority of the kids with SC and 1A gene mutations suffered the onset of seizures at four, six, eight months of age. In other words, the change, they showed that the timing of the change for the worse was consistent with the gene mutation causing the problem. And they also showed in laboratory animals there was a shift from using the SC and 1B ion channel to the SC and 1A ion channel at about the equivalent of a four, six-month age. These were mice and rats. Basically they showed the ALFN test that is required of petitioners requires a medical theory. It requires a proof of logical sequence of cause and effect. And it requires an appropriate temporal relationship between the vaccination and the child's injury. The respondent, the secretary, should be required to make the same kind of showing. Can I just ask as a factual matter on that medical theory of causation? So this would be what loving factor four, and I forget what factor, and often one of them. The special master, after discussing the material focused on the genetic mutation and where on the genome, this very large molecule, this one occurred, then said separately, the second deficiency of petitioner's theory is more fatal to the claim. This is the paragraph at, I guess, appendix page 55. And says, Dr. Bowles did not persuasively explain how the vaccines interacted with the mutation to worsen the anticipated phenotype, or even how they could do so. What is, on what basis would we find that finding lacking in substantial evidence? Well, Dr. Truman testified that the genetic mutation and the brain abnormalities associated with it made a child more susceptible to developing seizures. But the fever associated with the vaccine, everyone agrees that occurred, that caused a seizure. In his opinion, it was the first seizure, but if you accept the special master's finding that there were at least one prior seizure, it changed the seizure disorder from maybe one or a few seizures to constant seizures. So there was a change in the seizure pattern, too, but that vaccine-related seizure was the first seizure documented in the medical records, and from that point on, she had a catastrophic seizure disorder, and many other changes as well, cephalopathic changes. So did, I think Judge Moore read a portion of Dr. Descartes' expert report seeming to recognize that the fevers caused seizures, and once you have seizures, it causes lingering effects on the brain that could cause more. What is the, are you saying that Dr. Bowles also testified to the vaccine-fever-seizure connection? I have to say, honestly, I don't know whether he testified to that connection. Thank you.